CORNING SAVINGS & LOAN ASSOCIATION; and The Corning Bank

v.

FEDERAL HOME LOAN BANK BOARD, et al.

No. LR–C–83–69.

United States District Court, E.D. Arkansas, W.D.

Sept. 19, 1983.

John P. Gill and Jack Fink, Gill, Skokos, Simpson, Buford & Owen, Little Rock, Ark., for plaintiffs.

James T. Lantelme, Jonothon K. Heffron and Harvey Simon, Washington, D.C., for Federal Home Loan Bank Board.

James W. Lance, Little Rock, Ark., and John F. Forster, Jr., Wallace, Hilburn, Clayton, Calhoon & Forster, North Little Rock, Ark., for Pocahontas Federal Sav. & Loan.

## MEMORANDUM OPINION

ROY, District Judge.

The instant complaint involves an action by Corning Savings and Loan Association ("Corning S & L") and Corning Bank against the Federal Home Loan Bank Board ("Board" or "Bank Board"), its individual members, and Pocahontas Federal Savings & Loan Association ("Pocahontas"), concerning the Board's approval of an application by Pocahontas to open a branch office in Corning, Arkansas. Plaintiffs have asked for the following:

(1) a stay of Board Resolution No. 83–41, dated January 20, 1983 ("Resolution"), whereby Pocahontas' application for the Corning branch was approved;

(2) the reversal and quashing of the Resolution;

(3) a temporary and permanent injunction halting the operation of the new branch office;

(4) a declaratory judgment that the Board is without authority to approve branch office applications until it adopts regulations to implement the Community Reinvestment Act and to consider undue injury to commercial banks;

(5) an order directing the Board to promulgate such regulations and to adopt constitutionally sound procedures for protesting branch office applications;

(6) the award of $25,000 damages; and

(7) an order directing the Board to file with the Court all documents and other matters considered by the Board in reaching its decision.

By Order dated April 13, 1983, the Court denied the plaintiffs' motion for a stay of the Resolution. The remaining issues raised in the complaint have been presented by the defendants for resolution via motions for summary judgment, to which the plaintiffs have filed their response. Also pending before the Court are the defendants' motions for protective orders whereby they seek to prevent the plaintiffs from conducting further discovery. It is the defendants' contention that the resolution of this case should be based solely upon the administrative record[1] which was compiled in conjunction with Pocahontas' branch application, and that further discovery is improper.

A hearing was held on the motions for summary judgment and for protective or-

1. A copy of this record, which contains 1,257 pages, was filed with the Court as an attach- ment to the Board's motion for summary judgment.

ders on May 19, 1983, after which the parties were given the opportunity to file supplemental briefs. These briefs have now been received and the matter is ready for decision.

The Court has carefully considered the excellent briefs which have been filed herein and the arguments of counsel, each of whom has thoroughly and most competently presented his client's position to the Court. Upon review, the Court finds (1) that the matter should be resolved on the defendants' motions for summary judgment; (2) that said motions must be granted; and (3) that the defendants' motions for protective orders should be granted.

The record reflects that the background of this case is as follows:

On March 3, 1982, Pocahontas filed an application with the Board to establish a branch office at the intersection of West Pine and West Second Streets in Corning, Arkansas. The application proposed that the branch would serve all of Clay County, Arkansas, the primary market area ("PMA"). Supporting geographic, demographic, statistical and economic information was included in the application.

As permitted by Board regulation, 12 C.F.R. § 545.14(f), both plaintiffs filed written protests to the application, which protests were determined to be "substantial" by the Board's Supervisory Agent pursuant to 12 C.F.R. § 545.14(f)(2). Pocahontas submitted its written response to the protests as is provided for by 12 C.F.R. § 543.2(e).

Oral argument on the application was set by the Supervisory Agent for June 1, 1982, in Little Rock, Arkansas. Before the argument was held, Corning Bank brought suit against the Board in the Eastern District of Arkansas, *Corning Bank v. FHLBB*, LR–C–82–379, wherein an injunction halting the Board's processing of the application was sought. Subsequent to the filing of the lawsuit, the June 1, 1982, oral argument before the Board was postponed until July 7, 1982. On July 2, 1982, Corning Bank's complaint was dismissed by the Honorable George Howard, Jr., U.S. District Judge, as being premature.

The administrative oral argument was held on July 7, 1982, at the offices of the Federal Home Loan Bank of Little Rock ("Little Rock Bank") before the Board's Supervisory Agent, David Cockroft. During the course of the argument, plaintiffs made numerous motions and introduced many exhibits.

In the January 17, 1983, issue of the *Federal Register* an agenda was published wherein it was stated that the branch application of Pocahontas would be considered by the Board at 10:00 a.m., Thursday, January 20, 1983, at 1700 G Street, N.W., Washington, D.C. Said notice had been filed on January 13, 1983, and was first made public on January 10, 1983.

At the January 20, 1983, meeting, the Board adopted the aforementioned Resolution approving Pocahontas' branch application. In this Resolution the Board determined, *inter alia*, that "the branch can be established without undue injury to properly conducted existing local thrift and home-financing institutions," rejected the plaintiff-protestants' allegations of bias of the Supervisory Agent, and denied all of the protestants' motions which had been raised at the argument.

On January 21, 1983, Pocahontas submitted its Application for Final Approval of Exact Location of Authorized Branch Office to Supervisory Agent Cockroft, proposing that the approved branch be temporarily located at # 7 Huddle Plaza, Corning, Arkansas, pending construction of permanent quarters. On the same day, under authority delegated to him by the Board, Mr. Cockroft approved the Huddle Plaza location pursuant to 12 C.F.R. § 545.14(i). The branch then opened for business on the following day, January 22, 1983, and the instant suit was filed by the plaintiffs on January 26, 1983.

In their complaint plaintiffs allege bias and conflict of interest of the Supervisory Agent; improper communications by Pocahontas with the Board and its agents; improper denial by the Board of plaintiffs'

requests for information; failure of the Board to make "an independent decision in the application"; improper denial of plaintiffs' various motions filed during the oral argument; improper reliance by the Board on information not in the record; lack of adequate notice to protestants of the oral argument; lack of "substantial evidence" to support a finding of Pocahontas' compliance with the Community Reinvestment Act; an unlawful and arbitrary burden of proof on protestants to show why the application should be approved; and improper approval of the application based "upon incomplete, out-of-date, and materially misleading evidence and data" presented by Pocahontas.

Plaintiffs' Count I alleges that, because of the above claims, the Board's decision to approve the Application is arbitrary and capricious. Count II alleges denial of due process based on the above and upon plaintiffs' purported constitutionally protected property interest in their respective licenses. Count III alleges that there is no substantial evidence in the record "that either the Board Defendants or Defendant Pocahontas ... complied with the Community Reinvestment Act ..." Count IV alleges the Board has violated the Freedom of Information Act and "has denied Plaintiffs the right to information guaranteed thereby." Count V alleges the failure of the Board to follow "procedure required by law, and by the Board Defendants' own rules ..." Count VI alleges that the "Institutions Deregulation and Monetary Decontrol Act of 1980, 12 U.S.C. § 1464" [sic], and the Garn-St Germain Depository Institutions Act of 1982, P.L. 97–320, 96 Stat. 1469, have largely eliminated the difference between banks and savings and loan associations. Corning Bank alleges that, as a commercial bank, it thus has been denied equal protection and due process because the Board's regulations only recognize undue injury to properly conducted thrift and home-financing institutions as a basis for denying a branch office application. Finally, Count VII requests an injunction against the operation of the Pocahontas branch office at the Huddle Plaza site because operation of the branch office at that site is not in accord

with the provisions of the Board's Resolution.

Courts in this district have frequently decided challenges to approval of branch office applications on motions for summary judgment. *Poinsett County Savings & Loan Ass'n v. FHLBB*, 504 F.Supp. 610 (E.D.Ark.1980); *Bank of Ozark v. FHLBB*, 402 F.Supp. 162 (E.D.Ark.1975); *Merchants and Planters Bank of Newport v. Smith*, 380 F.Supp. 354 (E.D.Ark.1974). See, also, *Elm Grove Savings & Loan Ass'n v. FHLBB*, 391 F.Supp. 1041 (E.D.Wisc.1975).

■ The action complained of by the plaintiffs is an administrative decision by the Board that is subject only to very narrow review by this Court under the Administrative Procedures Act, 5 U.S.C. § 706. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Bank of Ozark v. FHLBB, supra; Elm Grove Savings & Loan Ass'n v. FHLBB, supra.* The appropriate standard of review is not the "substantial evidence" test, but rather the "rational basis" test. The rational basis standard permits review only of the existing administrative record and does not allow the establishment of a new record by the reviewing court. *Camp v. Pitts, supra; First National Bank of Baudette v. First Federal Savings & Loan Ass'n of Bemidji*, 670 F.2d 796 (8th Cir.1982); *Madison County Building and Loan Ass'n v. FHLBB*, 622 F.2d 393 (8th Cir.1980); *First Federal Savings & Loan Ass'n of Fayetteville v. FHLBB*, 426 F.Supp. 454 (W.D.Ark.1977), aff'd sub nom., *Fayetteville Savings & Loan Ass'n v. FHLBB*, 570 F.2d 693 (8th Cir.1978).

As the Eighth Circuit Court of Appeals stated in *Madison County Building and Loan Ass'n v. FHLBB, supra* at 397,

"Each year the FHLBB processes a large number of branch and charter applications, in addition to numerous other duties. It would significantly burden the Board to have to give an in-depth explanation of each of its actions merely because judicial review was a possibility. Congress apparently intended to give the FHLBB wide discretion to apply its ex-

pertise in this difficult area, and believed the exercise of that discretion should be subject to the very limited review of § 706(2)(A) [of the Administrative Procedures Act]. That review is conducted by comparing the agency action with the administrative record."

In *Camp v. Pitts, supra* 411 U.S. at 141, 93 S.Ct. at 1243, the United States Supreme Court held that the reviewing court is not "free to hold a *de novo* hearing." Rather, it observed at p. 142, 93 S.Ct. at p. 1244 that,

> "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court ..."

It is clear, therefore, that "branching" cases such as the one at bar should be resolved by means of summary judgment and that the district judges' inquiry is limited to consideration of the existing administrative record before the Board. See, *Elm Grove Savings & Loan Ass'n v. FHLBB, supra* at 1042, 1043:

> "... the question on review is whether there is at least *'some evidence' in the record* to support the agency's decision. So long as there exists *some rational basis* for the agency's action, it may not be upset on review..." [Emphasis in original.]

See, also, *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371 (8th Cir.1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), wherein the Court upheld the decision of the Comptroller to approve a charter application, even though "much of the evidence [in the administrative record] did not favor the establishment of the proposed bank," because the decision "was certainly not without some support in the record." 508 F.2d 1376. In so holding, the Court reiterated the applicable standard of review:

> "To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case...'" *Id.*

In the instant case, the Court has examined the administrative record and finds that it contains adequate evidence to support the Board's findings. Thus the Court finds that permitting the plaintiffs to engage in further discovery would be improper. *Elm Grove Savings & Loan Ass'n v. FHLBB, supra.*

With regard to the plaintiffs' substantive claims, the Court finds that the Board's decision to approve the Pocahontas branch was justified. As noted above, the Board exercises a wide degree of discretion in this area. No statutory criteria govern or limit the exercise of this discretion. The Board does have a regulation, however, which provides in pertinent part that the Board shall only approve the branch office application if, in its opinion,

> "(i) The branch can be established without undue injury to properly conducted existing local thrift and home-financing institutions;
>
> "(ii) The policies, conditions, and operation of the applicant afford no basis for supervisory objection; ..."

12 C.F.R. § 545.14(h)(i) and (ii).

An additional requirement set forth in 12 C.F.R. § 545.14(h)(iii) is that the Board "assess and take into account an institution's record of helping meet the credit needs of its entire community, including low- and moderate-income neighborhoods, pursuant to [12 C.F.R. §] 563(e) ..."

The question of "undue injury" is a matter of subjective evaluation which is clearly within the Board's special expertise. *Bank of Ozark v. FHLBB, supra; Bridgeport Federal Savings & Loan Ass'n v. FHLBB*, 199 F.Supp. 410 (E.D.Pa.1961), *aff'd*, 307 F.2d 580 (3d Cir.1962), *cert. denied*, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963). The basis of plaintiff Corning Bank's claim that the opening of the Pocahontas branch would cause it undue injury is the alleged elimination of the difference between commercial banks and thrift institutions by the Depository Institutions De-

regulation and Monetary Control Act of 1980, 12 U.S.C. §§ 3501, *et seq.* ("DIDMCA") and the Garn-St Germain Depository Institutions Act of 1982, P.L. 97–320, 96 Stat. 1469 ("Garn Act").

The courts in this district and circuit have recognized that the Board's separate classification of the two types of financial institutions is proper. *Bank of Ozark v. FHLBB, supra* at 169. The DIDMCA did not change the distinction. In upholding the distinction between thrift institutions and commercial banks, the Eighth Circuit stated that,

"Although the [DIDMCA] has eliminated some of the distinctions between commercial banks and thrift institutions, it has not obliterated them altogether. Savings and loans, unlike commercial banks, still have as their primary business focus the making of long-term loans for the purchase and construction of homes."

*First National Bank of Baudette v. Savings & Loan Ass'n of Bemidji, supra* at 797–798.

At the time Pocahontas filed its application, the Garn Act had yet to be enacted and, since its effectiveness was not made retroactive, it was irrelevant to the Board's consideration of this application. Even if the Garn Act had been effective before the application was filed, it still would not necessitate a change in the Board's treatment of commercial banks and thrift institutions because, as recognized by the Eighth Circuit, savings and loans continue to maintain the making of loans for residential purposes as their primary business focus.

Nonetheless, the Court finds that it is clear from the administrative record that Corning Bank would not suffer undue injury from the opening of Pocahontas branch. The record shows that Corning Bank has been increasing its deposit base in a county with an overall expanding savings base: Clay County, the PMA, in recent years has had an expanding economic base; the savings and loan institutions in Clay County, as well as the only commercial bank in town (Corning Bank), have experienced recent savings growth; there is only one other

savings and loan institution in Corning; and at the time the application was filed Pocahontas already had $1,488,543 of deposits in Clay County and thus was already a competitive and viable force. In light of these factors, the Court finds that there is ample support for the Board's determination that there was room for the opening of the Pocahontas branch in Clay County and that the opening of this branch would not cause undue injury to the financial institutions already in existence there.

As the Court stated in *Elm Grove Savings & Loan Ass'n v. FHLBB, supra* at 1044,

"Significantly, the governing regulatory test is not mere 'injury' to the plaintiff but 'undue injury.' In focusing on this criteria, the board was required to balance any possible injury to the plaintiff against the benefit to the residents of the developing service area, ... from an additional savings and loan facility."

See, also, *Guaranty Savings & Loan Ass'n v. FHLBB,* 330 F.Supp. 470, 473 (D.D.C. 1971), wherein the Court, in sustaining the Board's approval of a branch application, stated that,

"... the Court believes that the availability of a choice of financial institutions is in the public interest ... "

This view is consistent with the Board's official policy that "encourages a competitive savings and loan system that provides convenient, alternative choices of facilities for improved financial services to the public [and that] branching is a primary means to increase competition and serve the public." 12 C.F.R. § 556.5.

Thus, in view of the facts evident from the administrative record described above, the Court finds that the Board neither abused its discretion nor acted arbitrarily or capriciously in concluding that the opening of the Pocahontas branch in Clay County would not cause undue injury to the plaintiffs.

◼ The Court next addresses the plaintiffs' contention that the Board's approval of the Pocahontas branch should be invali-

dated because of the latter's failure to comply with the requirements of the Community Reinvestment Act, 12 U.S.C. §§ 2901, *et seq.* ("CRA," "the Act"). Plaintiffs contend that the Board's decision is "not supported by substantial evidence" of Pocahontas' compliance with the CRA and that the Board's regulations inadequately implement the CRA.

As a result of the enactment of the CRA in 1977, the Board promulgated various regulations to implement the Act's provisions. 12 C.F.R. §§ 545.14(h)(1)(iii), 556.5(c), and 563e. The latter section provides the general implementation of the CRA and outlines the responsibilities and duties of savings institutions and the Board under the CRA. Section 545.14(h)(1)(iii) specifically adds consideration by the Board of an applicant's CRA record "of helping to meet the credit needs of its entire community, including low- and moderate-income neighborhoods, pursuant to Part 563e . . ." as one of the criteria that must be addressed before approval of a branch office application can be granted. *See, also,* 12 C.F.R. § 556.5(c). Under both § 545.14 and § 563e.8, the Board may deny an application if the applicant has an unsatisfactory CRA record.

The factors that the Board will consider in assessing a savings institution's performance record under the CRA are set forth in § 563e.7. The CRA requires only that, in connection with its examination of a financial institution, the appropriate federal financial supervisory agency

"(1) assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution; and

"(2) take such record into account in its evaluation of an application for a deposit facility by such institution." 12 U.S.C. 2903.

The CRA itself does not provide for any sanctions for an unsatisfactory record, nor does it even define what an unsatisfactory record would be. The CRA merely requires that the Board assess an institution's community credit record and consider that record when evaluating branch applications. The Court finds that not only has the Board implemented the CRA, but that it has gone beyond the explicit requirements of the CRA so as to give meaning to the intent of the Act by allowing the Board to, in its discretion, deny an application due to an unsatisfactory CRA evaluation. 12 C.F.R. §§ 545.14 and 563e.8. Thus, as a matter of law, plaintiffs are incorrect in their claim that the Board has not implemented or has inadequately implemented the CRA.

The Court also finds as a matter of law that the administrative record in this case is fully supportive of the Board's compliance with the CRA in its decision to approve Pocahontas' branch application. The Board's application form for a branch office required Pocahontas to show its compliance with the Board's CRA regulations, and in its application, Pocahontas demonstrated its compliance with said regulations. In the legal opinion adopted by the Board, plaintiffs' charges of CRA noncompliance were addressed and found to be without merit. Further, the record shows that the Board, as a part of its continuing examination of all the institutions it regulates, has determined that Pocahontas' CRA record was satisfactory.

Plaintiffs contend that Pocahontas' application is deficient because it failed to publish a CRA statement for Clay County. A reading of 12 C.F.R. § 563e.3 and 4, however, shows that Pocahontas was under no obligation to prepare such a statement. Section 563.4(a) provides in relevant part that the institution must "adopt a . . . [CRA] statement for each delineated local community." Section 563e.3 defines "delineation of community" in terms of the boundaries of the counties or Standard Metropolitan Statistical Areas ("SMSA") in which the institution's office or offices are located. Since Pocahontas had no office in Corning or Clay County at the time of its branch application, the Court finds that it was not required under the above-cited regulations to submit a CRA statement for Clay County.

Plaintiffs also contend that Pocahontas has violated 12 C.F.R. § 563e.5(a)(1) by not making available to the public two complaints allegedly received by Pocahontas concerning its CRA record. 12 C.F.R. § 563e.5(a)(1) provides that,

"(a) Each institution shall maintain files that are readily available for inspection consisting of:

"(1) Any *signed, written* comments received from the public within the past 2 years that specifically relate to any CRA statement or to the institution's performance in helping to meet the credit needs of its community or communities; ..." [Emphasis supplied.]

The administrative record indicates that the two public complaints to which plaintiffs refer were neither written nor signed; thus Pocahontas did not violate 12 C.F.R. § 563e.5(a)(1) by failing to publicize these alleged complaints.

Because, as noted hereinabove, the standard of review for the Board's decision is the rational basis test rather than the substantial evidence test, the Court finds as a matter of law that the administrative record contains adequate indications that the defendants complied with the CRA requirements.

Turning now to the plaintiffs' procedural arguments, the Court notes that at the July 7, 1982, oral argument, plaintiffs made numerous motions to the presiding officer and to the Board, the essence of which was that the Board's procedures were constitutionally defective. All of the motions were denied, and the record contains a thorough explanation of the reasons therefor. The Court addresses each of the plaintiffs' claims as follows:

*Alleged bias of the Supervisory Agent*

■ Plaintiffs urge that the Board's Supervisory Agent was biased in favor of Pocahontas and that another agent from outside the Little Rock district should have been appointed. Throughout the application process, the Board's staff considered this complaint and found that no conflict existed. In addition, the Board stated in its Resolution that it found no conflict. The Court has reviewed the record and has found no evidence of bias or conflict therein; to the contrary, it appears that the Supervisory Agent handled these proceedings in a fair and impartial manner.

Plaintiffs' claims of bias are based solely upon the fact that Mr. Joe R. Martin, the president of Pocahontas, was also one of the eighteen members of the Federal Home Loan Bank of Little Rock, the Supervisory Agent's employer. It is the finding of the Court that even if the plaintiffs' allegations of bias were true, as a matter of law the Board's decision to grant Pocahontas' application is nevertheless untainted for the following reasons:

Under the Board's regulations, the Supervisory Agent, although an employee of the Little Rock Bank, when compiling and reviewing branch office applications acts as an Agent for the Bank Board. 12 C.F.R. §§ 501.10 and 541.21. The decision as to the approval or denial of an application in a case such as this where there are substantial protests can only be made by the Board and not by the Supervisory Agent. 12 C.F.R. § 545.14(h)(1), (2). The nature of a branch office application process is that the Supervisory Agent is merely a conduit of information to the Board. The Agent is neither a hearing officer nor an administrative law judge, since the oral argument before the Agent is not an evidentiary or adjudicatory hearing. *First Federal Savings & Loan Ass'n of Fayetteville v. FHLBB, supra.*

Nor did the Agent in this case make any of the ultimate decisions. As the administrative record clearly indicates, each initial procedural determination made by the Supervisory Agent concerning motions raised during oral argument was reviewed by the Board, which made the ultimate and definitive decision on each issue, including the final approval of the branch. None of the Agent's decisions were binding on the Board. Since the Agent is not the final decision-maker, any bias on his part does not taint the ultimate, independent decision of the Board. See, in this regard, *Skokie*

*Federal Savings & Loan Ass'n v. FHLBB,* 400 F.Supp. 1016 (N.D.Ill.1975); *Fidelity Financial Corp. v. FSLIC,* 359 F.Supp. 324 (N.D.Cal.1973). In the latter case, a Board investigator was found to have solicited bribes from an association seeking approval from the Board of an acquisition. The association, in seeking to enjoin the Board from interfering in the proposed acquisition, claimed that the investigator was biased against it in making his recommendation to the Board. The Court held that despite the obvious bias of the examiner, the Board's decision was untainted because the plaintiff did not show bias on the part of the Board itself. *See, also, DeLucia v. Immigration & Naturalization Service,* 370 F.2d 305 (7th Cir.1966), *cert. denied,* 386 U.S. 912, 87 S.Ct. 861, 17 L.Ed.2d 784 (1967); *Standard Distributors v. FTC,* 211 F.2d 7 (2d Cir.1954); *NLRB v. Air Associates, Inc.,* 121 F.2d 586, 588 (2d Cir.1941) ("the Board must be presumed to be capable of resisting any unfair attitudes expressed to it by its subordinates . . .").

Thus, it is the Court's finding in the instant case that even if the Supervisory Agent had been biased in favor of Pocahontas (of which there is no evidence in the record), such would not invalidate the Board's decision. As a matter of law, therefore, the plaintiffs' claims concerning the alleged bias of the Agent are without merit, since the Board and not the Agent rendered the ultimate decision on the branch application.

### Alleged inaccuracy of Pocahontas' application

■ Plaintiffs contend that the Board's decision is arbitrary and capricious because the information supplied by Pocahontas was "incomplete, out of date, and materially misleading." The Court finds this claim to be totally irrelevant to the validity of the Board's decision. Plaintiffs had an opportunity to demonstrate any inaccuracies in Pocahontas' data at the oral argument and were afforded the chance to place what they deemed to be the correct data before the Board. This Court cannot

now engage in a *de novo* review of the correctness of the information before the Board. *Elm Grove Savings & Loan Ass'n v. FHLBB, supra.*

In cases of this nature, where the Board may have information before it which could conceivably justify a decision either way, the Board's discretion and special expertise come into play in deciding whether to grant an application. *Bank of Ozark v. FHLBB, supra.* Here the Board had both Pocahontas' and the plaintiffs' information before it when it made its decision. Under the arbitrary and capricious standard of review mandated by 5 U.S.C. § 706, this Court may not substitute its judgment for that of the Board, even if the Court believed the Board's decision to be incorrect. *Madison County Building & Loan Ass'n v. FHLBB, supra.*

Having reviewed the administrative record in this case, the Court cannot say that the Board's decision was arbitrary and capricious due to any incorrect or inaccurate information supplied by Pocahontas. Thus, the plaintiffs' argument on this point must fail as a matter of law.

### Failure of the Board to make findings

■ The plaintiffs contend that the Board acted arbitrarily and capriciously in failing to "make an independent decision . . . but instead [adopting] an 'opinion and appendix of the Office of General Counsel' . . ." The law in this district and circuit is well settled that the Board need not make *any* findings of fact or conclusions of law. *Madison County Building & Loan Ass'n v. FHLBB, supra; Central Arkansas Savings & Loan Ass'n v. FHLBB,* 495 F.Supp. 703 (E.D.Ark.1980); *Benton Savings & Loan Ass'n v. FHLBB,* 365 F.Supp. 1103 (E.D.Ark.1973). *See, also, Guaranty Savings & Loan Ass'n v. FHLBB, supra.* In deciding whether to grant a branch application the Board is not required to give a detailed explanation of its decision, but need only give a sufficient explanation so as not to frustrate effective judicial review. *Camp v. Pitts, supra; Madison County Building & Loan Ass'n v. FHLBB, supra.*

■ The Court finds that in the instant case the Board has gone well beyond the minimum requirements for providing a record and an explanation for its decision. The Resolution combined with the administrative record is sufficient to enable this Court to review the Board's decision and to find that decision to have a rational basis. It is clear from a reading of the Resolution that the Board considered the opinion and appendix of the Board's Office of the General Counsel agreed with the recommendations therein, and simply adopted the opinion and appendix for the sake of convenience. No improper delegation of authority occurred because the Office of the General Counsel cannot, by law, make any decision concerning a branch office application, but is limited to making recommendations; only the Board is authorized to make the final decisions. 12 C.F.R. § 545.14. In view hereof, the Court finds that the defendants are entitled to summary judgment on this issue.

### Consideration by the Board of information outside the administrative record

■ Plaintiffs claim that the Board's approval of the application was arbitrary and capricious because the Board relied on "documents, reports, communications and other 'evidence' which is not part of the record and has not been disclosed to the Plaintiffs." Under the Board's public information regulation, 12 C.F.R. § 505.5, internal Board information and reports of examinations containing confidential financial data and opinions of the Board's staff are expressly exempt from public disclosure. See, also, 5 U.S.C. § 552(b)(4), (5) and (8) (Freedom of Information Act). Moreover, the Board's statement of policy concerning branch office applications specifically permits the Board to "approve or deny an application based on *any* information available to it, not just information presented by either applicant or protestant(s)." [Emphasis supplied.] 12 C.F.R. § 556.5(f).

Courts have consistently held that the record on review of administrative action, rather than containing the aggregate of all documents that were before the agency when it made its decision, should include only those documents constituting the factual data from which the agency made its decision. Advisory opinions of staff members as to what the agency's decision should be are not considered to be part of the record on review. *First Federal Savings & Loan Ass'n v. FHLBB, supra* 457–458, *aff'd sub nom., Fayetteville Savings & Loan Ass'n v. FHLBB, supra.*

In view hereof, the Court finds that the Board's consideration (if any) of information not contained in the administrative record or not released to the plaintiffs was not an abuse of discretion. The plaintiffs' claim in this regard must therefore fail as a matter of law.

### Alleged improper communications with Board members and staff

■ Plaintiffs allege that the Board's approval of Pocahontas' application was not in accordance with the law because there were improper contacts between Pocahontas and the Board members and staff during the pendency of the application. Affidavits filed herein by Board Member James J. Jackson, Board Chairman Richard T. Pratt[2], Pocahontas President Joe R. Martin, and Supervisory Agent David E. Cockroft confirm that no unlawful communications took place. Rather, the only communications which occurred were inquiries by Pocahontas with regard to the processing status of the application, which are expressly permitted under 12 C.F.R. § 510.1(c).

Nothing in the record lends support to the plaintiffs' claim that Pocahontas unlawfully obtained "advance insider information" concerning their application. In light of the affidavits filed herein which support the contrary conclusion, the Court finds as a matter of law that this claim of the plain-

---

2. The late Andrew DiPrete resigned as a Member of the Board effective June 30, 1982. As of the date of this writing, the Court has not been advised of who, if anyone, has been named as Mr. DiPrete's replacement. In any event, Chairman Pratt and Member Jackson are the only individual Board Members with whom the present suit is concerned.

tiff is without substance and therefore must fail.

*Alleged denial of plaintiffs' due process rights by the Board's regulations*

█ Plaintiffs claim violations of their right to due process under the Fifth Amendment to the Constitution by the Board's branch office application procedures, contending that said procedures provided them inadequate notice of oral argument, no discovery process, no right to cross-examine witnesses, and an unlawful and arbitrary burden of proof. Plaintiffs further allege that the issues discussed above regarding their substantive claims serve to deny them due process.

The Court notes at the outset that plaintiffs have no constitutional right to be free from competition. *Bank of Ozark v. FHLBB, supra* at 169; *Bridgeport Federal Savings & Loan Ass'n v. FHLBB, supra.*

Further, as noted earlier in this opinion, the branch office application process is one whereby the Board gathers information to be used by it in passing on the application. It is not an adjudicative hearing. All courts which have considered this issue have concluded that the process is merely an informal fact-gathering one. See, *e.g.,* *Camp v. Pitts, supra; Central Savings & Loan Ass'n v. FHLBB,* 422 F.2d 504 (8th Cir.1970); *First Federal Savings & Loan Ass'n of Fayetteville v. FHLBB, supra,* aff'd sub nom., *Fayetteville Savings & Loan Ass'n v. FHLBB, supra; Bank of Ozark v. FHLBB, supra; Benton Savings & Loan Ass'n v. FHLBB, supra.*

In requesting notice, discovery, cross-examination of witnesses and findings of fact, plaintiffs are seeking a full adjudicative hearing under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.,* and are also attempting to elevate their requests to a requirement under the Fifth Amendment. The Eastern District of Arkansas has previously rejected this argument in *Bank of Ozark v. FHLBB, supra* at 166:

"[I]t is now established beyond doubt that the Board is not required by the Constitution, the Home Owners' Loan Act, or the Administrative Procedure Act to conduct adversary evidentiary hearings, to make formal findings of fact, to draw formal conclusions of law, or to file written opinions supporting the actions taken; nor is the party seeking review entitled to a de novo hearing before the reviewing court. *Pitts v. Camp,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Merchants & Planters Bank of Newport, Arkansas v. Smith,* 516 F.2d 355 (8th Cir.1975), aff'g *Merchants & Planters Bank of Newport v. Smith,* 380 F.Supp. 354 (E.D.Ark.1974); *First National Bank of Fayetteville v. Smith,* 508 F.2d 1371 (8th Cir.1974); *Central Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 422 F.2d 504 (8th Cir.1970); *Webster Groves Trust Co. v. Saxon,* 370 F.2d 381 (8th Cir.1966); [other citations omitted]."

The question of whether the Board's branch application regulations impose an improper burden of proof on protestants to such an application has likewise been considered by courts of this district and circuit and no impropriety has been found. In *First Federal Savings & Loan Ass'n of Fayetteville v. FHLBB, supra* at 461–462, plaintiffs argued that the Board's policy statement favoring the establishment of branch offices (12 C.F.R. § 556.5(b)(5)) erroneously shifted the burden of proof from the branch applicant to the protestant. The Court disagreed, holding that the applicant "met its burden by providing ample evidence of . . . lack of undue injury to existing institutions." *Id.* The Eighth Circuit affirmed this holding, stating that the Board's policy statement favoring branch offices did not illegally shift the burden of proof to protestants. *Fayetteville Savings & Loan Ass'n v. FHLBB, supra* at 699–700.

The Court finds that in the case at bar plaintiffs have not established any constitutional violation of due process which would entitle them to relief, and that consequently the defendants are entitled to judgment as a matter of law on this claim.

*The change of the branch office location to Huddle Plaza*

█ On January 21, 1982, after the Board had approved Pocahontas' application

on January 20, 1982, Pocahontas submitted an application for approval of a temporary office at the Huddle Plaza Shopping Center in Corning, Arkansas, approximately one mile away from the permanent location at West Second and Pine Streets. The Supervisory Agent approved the application on the same day it was sought.

Plaintiffs contend that the branch office was opened illegally in the Huddle Plaza location because the Resolution approved the application with the proviso "that the exact location of such branch office is approved by the Board before such branch office is established . . ."

The Court finds that the branch office was lawfully opened in the Huddle Plaza Shopping Center. The Supervisory Agent clearly had authority to approve the temporary location pursuant to 12 C.F.R. §§ 501.-10, 541.21 and 545.14(i), the latter of which provides that,

"The Supervisory Agent may approve a temporary and/or permanent location of an approved branch office if the new location is in the immediate vicinity of the approved location and would not be more strongly competitive to any other properly conducted existing thrift and home-financing institution than at the approved location."

The Court finds that consideration and approval of such a change in location under 12 C.F.R. § 545.14(i) is a routine ministerial matter that has been delegated by the Board to the Supervisory Agent. There is no requirement under statute, regulation or case law that either the Board or the applicant provide notice or provide any findings concerning location changes under § 545.-14(i). *Camp v. Pitts, supra; Bank of Ozark v. FHLBB, supra.*

As indicated in the Board's January 20, 1982, Resolution, Pocahontas was given permission to "establish a branch office to be located at, or in the immediate vicinity of the intersection of West Second Street and Pine Street, Corning, Clay County, Arkansas." The standards used by the Board to determine "immediate vicinity" as that term is used in both the Resolution and in

12 C.F.R. § 545.14(i) are the same as the standards used by the Board for short-distance office relocations as set forth in § 545.15(d), namely, in a central city of a Standard Metropolitan Statistical Area ("SMSA"), "immediate vicinity" is within a 1,000-foot radius, while outside an SMSA, "immediate vicinity" is within a two-mile radius. Since Corning, Arkansas, is not in an SMSA, the approved temporary location at Huddle Plaza less than two miles away from the West Second and Pine Street site was properly authorized by the Supervisory Agent and was properly within the contemplation of the Board's resolution.

Further, there is evidence in the record to support the conclusion that the move to Huddle Plaza would not cause Pocahontas to be more strongly competitive to the existing financial institutions in the PMA, in that the Huddle Plaza location is removed from the primary business district in which original site for the Pocahontas branch was approved and in which the plaintiffs' institutions are located.

The Court thus finds that the approval by the Supervisory Agent of the temporary location was proper and was in conformance with the Board's own regulations, a factor to which the Court must give considerable weight. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). On this issue, therefore, the defendants are entitled to judgment as a matter of law.

### Freedom of Information Act

In a letter received by the Board on April 26, 1982, plaintiffs requested information from the Board pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). Pursuant to the FOIA and its regulations, 12 C.F.R. § 505.5, the Board timely responded to the requests in a letter dated May 27, 1982. Some of the requested information was provided, while some was withheld pursuant to exemptions claimed under the FOIA and 12 C.F.R. § 505.5(a). Plaintiffs were additionally informed that some of the information sought did not

exist. Finally, plaintiffs were notified of their right to appeal should they be dissatisfied with the Board's response.

In *Corning Bank v. FHLBB,* LR–C–82–379, referred to earlier in this opinion, plaintiff Corning Bank attempted to enjoin the Board's oral argument and consideration of the application due to, *inter alia,* the Board's alleged unresponsiveness to Corning Bank's FOIA request. This suit was dismissed. At no time prior to the oral argument or prior to the Board's final decision did plaintiffs avail themselves of their right to seek review of the Board's response under the FOIA. As it presently stands before the Court, plaintiff's complaint is not an FOIA appeal.

Since plaintiffs have failed to exhaust the remedies available to them under the FOIA, this Court will not consider the alleged FOIA violations as a reason for quashing the Board's approval of the Pocahontas application.

In view of all of the reasons set forth hereinabove, summary judgment is hereby entered in favor of the defendants, and defendants' motions for protective orders prohibiting further discovery are hereby granted.